UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       - v. -                                  :                    13 Cr. 289 (AKH)

DAVID CORREA,                               :

                Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                                       PREET BHARARA
                                       United States Attorney for the
                                       Southern District of New York
                                       Attorney for the United States of America

Edward B. Diskant
Assistant United States Attorney
       - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       - v. -             :         13 Cr. 289 (AKH)

DAVID CORREA,             :

            Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

       The Government respectfully submits the following memorandum in connection with the sentencing of David Correa (the "defendant"), which is scheduled for January 30, 2014 at 2:30 p.m.   For the reasons that follow, the Government respectfully submits that the applicable, advisory Guidelines' range in this case is 41-51 months' imprisonment, based on a total, adjusted offense level of 22, and that a sentence within that Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).   Alternatively, and even if the Court should calculate the Guidelines range differently, the Government nonetheless believes that a sentence within the range of 41 to 51 months' imprisonment is appropriate in this case.

## I.  BACKGROUND

### A.    <u>Offense Conduct</u>

       The defendant was charged on April 17, 2013 by Indictment 13 Cr. 289 (AKH) with one count of conspiracy to commit health care and wire fraud, and one count of conspiracy to receive and distribute misbranded and adulterated drugs.   The charges stem from the defendant's participation in a massive prescription drug diversion scheme, principally involving medications

used to treat illnesses such as HIV/AIDS.   Specifically, the defendant, as a pharmacy owner, purchased thousands of bottles of second-hand medications off the black market, knowing full well that these bottles had been previously dispensed to other patients, before re-dispensing the same to his unsuspecting customers.   In so doing, the defendant also billed Medicaid and other health care benefit programs (collectively, "Medicaid") for these "second hand" drugs without disclosing that the medicines had been purchased off the black market and knowing full well that Medicaid would not have paid for these medicines had it known their true origin.

On August 26, 2013, the defendant pleaded guilty to both counts of the Indictment without an agreement with the Government.   As part of his allocution, the defendant admitted to purchasing and reselling bottles of medicine from two co-conspirators, Luis Santana and Bayohan Diaz, between 2010 and 2012.   According to the defendant, he dispensed bottles of second-hand medicine to his customers "more than 30 times" during that period, knowing full well that the bottles "had been previously dispensed to patients with valid prescriptions by other pharmacies" and from which "the prescription labels were removed before" the defendant received them.   (Plea Tr. 11:16-25.)  The defendant further admitted to "bill[ing] Medicaid and the other insurance plan[s] for reimbursement" as if the bottles were new, legitimate medications.  (*Id.* at 12:16-17.)

**B.**     **The Fatico Hearing**

On January 14 and 16, 2014, the parties conducted a *Fatico* hearing and presented evidence regarding several factual issues in dispute, namely the loss caused by the defendant's participation in the scheme, as well as the risk of serious bodily injury created through the defendant's conduct.   During that hearing, the Government offered the testimony of two of the defendant's co-conspirators, Luis Santana and Bayohan Diaz, each of whom testified pursuant to

a cooperation agreement with the Government, as well as the testimony of Dr. Anthony Zook, the Director of Product Integrity at Merck.   The defendant offered certain records from his pharmacy ostensibly documenting the loss caused to Medicaid by his conduct.

Santana and Diaz both testified to making repeated sales – each involving dozens of bottles of second-hand medicine – to the defendant.   Diaz, for example, testified to personally participating in 4-5 deliveries of medicine to the defendant, each of which involved "150 to 180" bottles of various medicines.  (Transcript of Hearing dated January 14-16, 2014 ("Hearing Tr.") at 35:5.)  Santana testified to delivering medicines to the defendant at least 15 times, further testifying that an average sale to the defendant involved nearly 100 bottles of various medicines which Santana sold to the defendant for $8,000 to $12,000 in cash (*Id.* at 127:25-128:2, 133:13-21).   The defendant's own records largely corroborated that testimony.   Indeed, the defendant's records confirm that the defendant purchased *more than 2,000* bottles of various medicines from Santana and Diaz over the two-year period in question – including all of the various types of medicines which Santana and Diaz testified to selling to the defendant.   According to the defendants' records, these second-hand medicines – all of which the defendant concedes he re-dispensed to his patients and fraudulently billed Medicaid for – had a combined Medicaid reimbursement value of nearly $365,000.   (Def. Ex. ("DX") A-B.)

The Government's witnesses also testified to the source of these second-hand medicines and the manner in which they were handled.  Santana, for example, testified that the medicines were purchased "from the street" from people who "got it with their Medicaid."  (Hearing Tr. at 119:15, 140:25.)   Both Santana and Diaz testified to storing and transporting these second-hand bottles in beer boxes, shoe boxes, and laundry bags in Santana's house, and the Government offered various photographs taken at Santana's house on the day of his arrest, showing hundreds

of these second-hand bottles stored haphazardly in various boxes and containers.  (*E.g.*, Gov't Ex. ("GX") 106A-F.)

Diaz and Santana also testified to manner in which they "cleaned" the bottles – that is, removed the original patient labels affixed when these black market drugs were previously dispensed, so that corrupt pharmacy owners like the defendant could fool patients and Medicaid into believing these bottles were new, legitimately obtained medicines.   Diaz, for example, testified to using "Ronsonol" – a form of lighter fluid that is harmful or fatal if swallowed – and, in particular, to dousing the bottles with Ronsonol and leaving these bottles of medicine to soak for 5 to 10 minutes in the lighter fluid so that the Ronsonol could dissolve the adhesive used to affix the patient label.  (Hearing Tr. at 27:7-28:17.)   Santana similarly testified to having Diaz clean the bottles, adding that Santana was unable to do so himself because the fumes from the Ronsonol made him physically ill.  (*Id.* at 120:25-121:4.)

Finally, the Government called Dr. Anthony Zook, the Director of Product Integrity at Merck.  Dr. Zook testified that he and others at Merck had tested certain bottles of the Merck medicine Singular which were recovered as part of this investigation from co-conspirators like Santana and Diaz, who purchased bottles off of the streets before using lighter fluid to "clean" the bottles.  (*E.g.*, GX 302.)   Dr. Zook testified that as a result of this testing, he determined that these second-hand bottles, which were "factory sealed" at the time they were recovered from a co-conspirator like Santana who was attempting to unlawfully redistribute them (Hearing Tr. at 94:10-12), were nonetheless seriously tainted.  Specifically, Dr. Zook testified to finding "adulteration of long chain hydrocarbons" within the *pills themselves*, further testifying that the "long chain hydrocarbons" found in these pills were "C13 and C14" hydrocarbons which are identified with "spirits, lighter fluid [and] certain industrial solvents."  (*Id.* at 97:5-14.)   Dr.

Zook also testified to how these long chain hydrocarbons like lighter fluid managed to infiltrate the otherwise-sealed bottles, noting that the plastic used to create most standard medicine bottles is simply not equipped to handle direct exposure to these sorts of hazardous chemicals. (*Id.* at 99:12-14.). As a result, Dr. Zook testified that "when directly exposed to these organic solvents, the organic solvent will actually permeate the plastic bottle and become absorbed into the tablets contained within the bottle." (*Id.*).

While Dr. Zook was careful to clarify that he was not a medical expert, he was unequivocal when asked about Merck's view of the safety of these adulterated bottles: as Dr. Zook testified, these adulterated bottles should be "destroyed" because they "would not be considered safe or efficacious under Merck quality standards." (*Id.* at 99:2-4.)

Dr. Zook also provided background on the legitimate distribution of bottles of prescription medications. In particular, Dr. Zook testified to Merck's use of authorized and licensed wholesalers and distributors who are required to keep careful records – known as "pedigrees" – documenting the movement of bottles of Merck medicine. As Dr. Zook further explained, the purpose of this paperwork is to ensure that pharmacy owners, like the defendant, know exactly where the bottles of medicine they dispense have come from and can be assured that the bottles they are handing to their sick patients are legitimate and untainted. Dr. Zook further testified that the purchase of medicines from unlicensed distributors or sources, such as criminals peddling black market drugs, is illegal. (*Id.* at 103:16-106:19.)

Finally, the defendant offered certain of his own records ostensibly documenting the number of bottles of medicine the defendant purchased from Santana and Diaz, along with the amounts Medicaid had reimbursed the defendant for these bottles. According to these records, the defendant purchased approximately 2,110 bottles of various medicines from Santana and

Diaz during the two-year period in question, and re-dispensed the same to his patients,

fraudulently billing Medicaid approximately $364,455.30 in the process.  (DX A-B.)

At the conclusion of the hearing, the Court determined that the Medicaid value of the

second-hand medicines purchased by the defendant from Santana and Diaz and re-dispensed

through his pharmacy was approximately $365,000.  (Hearing Tr. at 216:22.).   The Court left

open, however, the issues of "loss amount" for purposes of a Guidelines calculation, along with

the applicability of one or more offense-specific enhancements.

### C.    The Guidelines Range

For the reasons discussed further below, the Government respectfully submits that the

November 1, 2013 Guidelines Manual should be applied to Counts One and Two of the

Indictment in the following manner:

1.    Pursuant to U.S.S.G. § 3D1.2 (d), Counts One and Two are grouped together as one (the "Group").

2.    The applicable sentencing guideline to the Group is U.S.S.G. § 2B1.1. Pursuant to U.S.S.G. § 2B1.1(a), the base offense level is seven.

3.    Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), a 14-level increase is warranted because the loss exceeded $400,000, but was not more than $1,000,000.

4.    Pursuant to U.S.S.G. § 2B1.1(b)(15), a two-level increase is warranted because the offense involved the conscious or reckless risk of death or serious bodily injury.

5.    Pursuant to U.S.S.G. § 3B1.3, a two-level increase is warranted because the defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

6.    Because the defendant clearly demonstrated acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, because the defendant has accepted responsibility as described in the previous paragraph, an additional one-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his

intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Consistent with the above, the defendant's total, adjusted offense level is 22. The defendant has no known criminal history and, as such, is in Criminal History Category I.

With a total offense level of 22, and a Criminal History Category of I, the advisory, applicable Guidelines range is 41 to 51 months' imprisonment.

     *1.*    *The Loss Amount*

Pursuant to U.S.S.G. § 2B1.1., the Court is directed to determine the "greater of actual loss or intended loss." Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense," which is, in turn, defined to include "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(i), (iv).

Here, there is no dispute that for every bottle involved in the scheme – that is, every bottle unlawfully obtained by the defendant and then re-dispensed through the defendant's pharmacy – Medicaid was charged twice. First, in what the Government has referred to as the "front end" loss, Medicaid was charged when the bottle was initially dispensed to a patient who, rather taking the medicine, sold it. Second, in what has been referred to as the "back end" loss, Medicaid was charged again when the defendant, after buying this previously dispensed bottle, *re-dispensed* it to one of his patients, charging Medicaid again *for the very same bottle*.

To be clear, there can be no dispute that Medicaid actually suffered both of these losses. Nor can there be any serious dispute that both losses were incurred through fraud. On the front end, Medicaid was lied to by "patients" who convinced Medicaid to foot the bill for bottles of medicine they had no intention of actually taking but instead planned to sell on the streets to

people like Luis Santana and Bayohan Diaz.  Simply put, Medicaid would not have paid for these medicines had it known that the "patients" planned to sell, rather than take, these medicines.  On the back end,  Medicaid was defrauded a second time when the defendant, as a pharmacy owner, billed Medicaid for bottles of medicine the defendant had purchased illegally off the black market.  Once again, there is no dispute that Medicaid would not have paid for these bottles had it known that these medicines had been unlawfully obtained from criminals rather than legitimately obtained from licensed wholesalers.

The total loss to Medicaid, as a result of the defendant's conduct, thus was approximately $730,000 – or the $365,000 Medicaid paid for the bottles when they were initially dispensed, and the $365,000 Medicaid paid for the exact same bottles when the defendant re-dispensed them after having purchased these bottles from the black market.   This figure represents the actual "pecuniary harm" caused by the defendant's conduct.  U.S.S.G. § 2B1.1 cmt. 3(A)(i)

Moreover, this figure represents the pecuniary harm that was "reasonably foreseeable" to the defendant since there is no question that the defendant knew, at the time he was re-dispensing these bottles to his patients, that the bottles he had purchased from Santana and Diaz had been previously dispensed to other patients – and thus previously paid for by Medicaid.  Indeed, the defendant has *admitted* as much, telling Your Honor, during his allocution, that "I learned that these medications" the defendant purchased from Santana and Diaz "had been previously dispensed to patients . . . by other pharmacies."  (Plea Tr. 11:20-22.) [1]

---

[1]    To the extent the defendant seeks to evade responsibility for this "front end" fraud by arguing that he did not know the identities of the individual Medicaid beneficiaries committing that aspect of the fraud, it is hornbook law that a member of a conspiracy, like the defendant, need not personally know all the other members of the conspiracy.  Nor can Correa, who as a pharmacy owner was well-versed in Medicaid's general requirements, plausibly contend that he was unaware that the co-conspirators were committing fraud by reselling, rather than taking as prescribed.  *Cf. Enrollee Fraud, Waste and Abuse* (New York Office of Inspector General website noting as an example of enrollee fraud "Re-selling items paid for by the

Moreover, and arguably more important, this scheme was financially lucrative for the defendant precisely because Medicaid had been defrauded twice with respect to each bottle:  the defendant was able to purchase second-hand bottles from Santana at ridiculously cheap prices – paying Santana roughly 20 percent of the sticker-value of each bottle – only because Santana had been able to buy them for pennies on the dollar from Medicaid patients who had received them *for free*.  In other words, no patient paying $1,000 out of pocket for a bottle of AIDS medication would have sold that same bottle to Santana for pennies on the dollar.  The scheme only worked – the 80 percent or higher profit margin the defendant cleared on each second-hand bottle he purchased from Santana – was only possible because Medicaid had been defrauded twice.

The loss figure advanced by the Government, thus, of approximately $730,000 does not represent "double counting."  It represents the undisputed *actual loss* caused by the defendant's conduct which is precisely what the Guidelines direct the Court to measure.   The defendant, by contrast, seeks to be held responsible only for half of that actual loss – that is, only for the $365,000 the defendant directly billed to Medicaid – despite the fact that the defendant does not and cannot dispute that his conduct actually resulted in a loss twice as high.  The defendant, in other words, seeks to be relieved from responsibility for a significant portion of a loss which he concedes (1) was actually suffered, and of which (2) he had actual knowledge.   The Government is aware of no basis in law for so doing – that is for simply ignoring half of the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense," U.S.S.G. § 2B1.1 cmt. 3(A)(iv) – and would urge the Court to adopt, as a loss amount, the $730,000 indisputably fraudulently billed to Medicaid for these bottles.

---

Medicaid program") (*available at* http://www.omig.ny.gov/fraud/fraud-abuse, last visited Jan. 13, 2014).

2.    *Conscious/Reckless Risk Enhancement*

Pursuant to U.S.S.G. § 2B1.1(b)(14), the Court is directed to add two-levels of the "offense involved . . . the conscious or reckless risk of death or serious bodily injury."   Serious bodily injury is defined, in the accompanying commentary, as, among other things, the sort of injury "requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."

As the Second Circuit has held, for the enhancement to apply, the Court must make two findings: *first*, that the "'defendant's fraudulent conduct . . . created a risk that others would suffer serious bodily injury'"[2]; and *second*, that the risk was "'either . . . known to the defendant (conscious), or, if unknown to the defendant, the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do (reckless).'" *United States* v. *Feldman*, 647 F.3d 450, 463 (2d. Cir. 2011) (quoting *United States* v. *Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003)).

With respect to both factors, however, the Second Circuit has never required that the Government prove that the defendant's conduct caused an *actual* "serious bodily injury" to a specific person.   It is instead sufficient for the Government to show that the defendant's conduct was of such a nature that the defendant either actually knew or should have known that his conduct was creating a risk that such an injury could occur.   For example, in *United States* v. *Lucien*, 347 F.3d 45 (2d Cir. 2003), the Circuit affirmed application of the enhancement against

_____

[2]   "Serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 comment. (n.1(L)). Courts have not hesitated to find that frauds which impact treatments for life-threatening illnesses such as HIV/AIDS inflict "serious bodily injury" for purposes of the Guidelines provision. *See, e.g.*, *United States* v. *Snyder*, 291 F.3d 1291, 1293, 1295 (11th Cir. 2002) (fraud targeting treatment for "the treatment of psoriasis and cutaneous T-cell lymphoma . . . meets the definition of serious bodily injury"). *United States* v. *Moon*, 513 F.3d 527, 541 (6th Cir. 2008) (fraud impacting chemotherapy doses creates risk of "serious bodily injury").

defendants who participated in a health care fraud scheme in which they staged automobile accidents and then feigned injuries arising from those accidents for which they sought benefits. As the Court explained, the defendants "participated in this health care fraud by riding as a passenger in a vehicle that was intentionally crashed into another vehicle."  *Id.* at 49.

Acknowledging that the "[n]o one was hurt in any of these collisions," the Circuit nonetheless affirmed application of the enhancement because "the serious risk of bodily injury was *inherent* to this type of criminal activity" – that is, to intentionally causing car accidents – and that, in so doing, "it is beyond cavil that [the defendant's] conduct as reckless."  *Id.* at 57 (emphasis added).   Consistent with *Lucien*, the Circuit has affirmed use of the enhancement in a wide variety contexts in which the risk of a serious injury to another was "inherent" in the defendant's conduct, even no actual injury to any specific person was ever established.  *See, e.g.*, *United States* v. *Wolosz*, 485 Fed. Appx. 509, 514 (2d Cir. 2012) (enhancement appropriately applied to defendant who hired someone to "intimidate" a witness to his fraud scheme, even though the witness was never actually harmed).   Other Circuits have similarly concluded.  *See, e.g.*, *United States* v. *Snyder*, 291 F.3d 1291, 1294-1295 (11th Cir. 2002) ("The  Guidelines . . . do not require that the victim actually suffer serious bodily injury. Rather, the question is whether the defendant placed the victim at such a risk."); *United States* v. *Vivit,* 214 F.3d 908, 921 (7th Cir. 2000) ("In cases of fraud, where [this provision] applies, we are not concerned with whether actual injury occurred, but whether the defendant's fraudulent course of conduct created a risk that others would suffer serious bodily injury.").

Consistent with that case law and the facts relevant to this scheme, judges in this district have routinely applied this enhancement to other participants in this scheme, finding that a risk of serious bodily injury was *inherent* in a scheme that involved adulterating HIV/AIDS

-12-

medications with toxic chemicals such as lighter fluid before distributing the same to unsuspecting patients who already had compromised immune systems as a result of their illnesses.  Indeed, the Government is not aware of *any* instance in which a judge in this district declined to impose this enhancement, where sought, against any other participant in this scheme. That includes this Court which imposed the very same enhancement on a co-defendant, Juan Pichardo, who much like the cooperators Santana and Diaz, was primarily responsible for purchasing and "cleaning" bottles of medicine before re-selling them.   Noting that "[w]e have regulation in the United States to make sure that people get the right drugs without adulteration," this Court concluded that what Pichardo and his co-conspirators had done "compromises that" and, indeed, compromised "the whole system of the purity of the drugs."  (*United States* v. *Juan Pichardo*, 13 Cr. 334 (AKH), Transcript of Sentencing dated November 22, 2013 ("Pichardo Sent. Tr.") at  12:21-13:3.)

Here, with respect to the first *Lucien* factor, the defendant unquestionably engaged in conduct that "created a risk that others would suffer serious bodily injury" because much like staging car accidents, the "risk of bodily injury was *inherent* to this type of criminal activity," *Lucien*, 347 F.3d at 57.   The defendant – a pharmacy owner well versed in the regulations imposed on the purchase of prescription medications – flouted those requirements and instead purchased bottles of medications used to treat serious illnesses on street corners from criminals selling the medicines out of beer boxes and shoe boxes and plastic bags.   He did so knowing that the bottles in question had previously been dispensed to other patients.   He then re-dispensed these bottles to unsuspecting patients who suffered from very serious illnesses, including HIV/AIDS patients who already suffered from weakened immune systems.  And he did so repeatedly – over 2,000 times by his own account – over a two-year period.

The risks inherent in the scheme the defendant's conduct also extend to the "front end" fraud – that is to the patients who were selling, rather than taking, their medications.  By purchasing these second-hand medicines knowing full well that they had been previously dispensed to other patients, the defendant was creating a black market that encouraged these Medicaid patients to sell their medicines rather than taking them as prescribed.  And the risks inherent to those patients are both concrete and serious.  The FDA approved packaging material for Atripla, one of the HIV drugs involved in the scheme, prominently states:  "Do not miss a dose of ATRIPLA. . . . This is very important because the amount of the virus in our blood may increase if the medicine is stopped for even a short time.  The virus may develop resistance to ATRIPLA and become harder to treat."  (Ex. A at 2.)   The packing for REYATAZ, another HIV drug involved in the scheme, similarly states: "It is important not to run out of REYATAZ. The amount of HIV in your blood may increase if the medicine is stopped for even a short time. . . . . **It is important that you do not miss any doses of REYATAZ or your other anti-HIV medicines."**  (Ex B. at 18) (bold in original).

Theses same risks, of course, would be present for any of the defendant's own patients who received doses of their medicines that had lost efficacy as a result of the adulteration inherent in the scheme.   Indeed, Dr. Zook testified unequivocally that Merck viewed these "second hand" bottles the defendant dispensed to his patients as "adulterated" and would have destroyed them because they "would not be considered safe or efficacious under Merck quality standards."  (Hearing Tr. at 99:2-4.)[3]   The harm the defendant's was all the more serious

---

[3]     The defendant's attempts, through counsel, to compare the dangers resulting from this conduct to the risk of taking medicines adulterated with a "chocolate chip cookie" (Hearing Tr. at 107:20-22), bespeaks a complete lack of comprehension of the seriousness of the offense and risk it posed to others.  Leaving aside the fact that a "chocolate chip cookie" could not pass undetected into a bottle – and thus present the sort of completely unforeseen danger to a patient – the clear thrust of Dr. Zook's testimony was that *any* foreign substance within a tablet meant for

because, unlike the "front end" patients, the defendant's patients had no reason to suspect they were "missing" doses or take unsafe or ineffective medicines.

In addition, the Court also heard testimony about additional concrete dangers to patient health created through this scheme.   Santana and Diaz testified to using Ronsonol – a power chemical which prominently states on its label that it is "harmful *or fatal* if swallowed" – to "clean" these bottles before selling them to the defendant.  Dr. Zook then testified that the Ronsonol had not only infiltrated the bottles but had penetrated the *tablets themselves*.  Patients receiving these second-hand bottles from the defendant, in other words, were unknowingly ingesting potentially lethal lighter fluid  in the process.  The defendant's patients did so repeatedly – every time they took a pill the defendant had sold to them – never knowing in the process the serious risks they were exposing themselves to.

With respect to the second *Lucien* factor, there can be no serious dispute that the risks described above were "obvious to a reasonable person" in the defendant's position and that his disregard for these risks "represent[ed] a gross deviation from what a reasonable person would do."  The Court heard testimony Dr. Zook about the legal distribution channels for prescription medications, including the "pedigree" requirements meant to document the legitimate travel of bottles of medicine from the manufacturer to the patients so that the safety of the bottles can be ensured.  The defendant not only disregarded these requirements but did so in a fashion that represents a "gross deviation" from what any reasonable and law-abiding pharmacy owner would do.   Indeed, while Your Honor observed, in imposing this enhancement on Juan Pichardo, that "there's no doubt of the ability of the human mind to disconnect between what one is doing and the consequences to the overall community," (Pichardo Plea Tr. at 7:21-23), no such

---

human ingestion renders the pill unsafe because Merck "do[esn't] differentiate on *how* unsafe something is.  It is either safe or unsafe."  (Hearing Tr. 107:14-15) (emphasis added).

"disconnect" was possible here – the defendant was himself causing these second-hand, adulterated medicines to be dispensed to patients he knew, customers he saw, people whose lives he was intimately familiar with.

As the Court observed at the *Fatico* hearing, "adulteration can create serious consequences" adding that the defendant's conduct created "a public health issue."   (Hearing Tr. at 221:14, 222:24-25.)  For precisely these reasons, application of the two-level enhancement for the reckless risk of death or serious bodily injury is appropriate in this case.

### 3.  The Vulnerable Victim Enhancement

Alternatively, the Court could impose a two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1) for an offense targeting "vulnerable victims."   A "vulnerable victim" means "a person . . . who is a victim of . . . any conduct for which the defendant is accountable . . . and . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct."

Courts in this and other circuits have applied this enhancement under similar circumstances.  For example, in *United States* v. *Milstein*, 401 F.3d 53 (2d Cir. 2005), the Second Circuit approved application of the enhancement to a pharmaceutical wholesaler who sold adulterated drugs used to treat fertility problems, Parkinson's disease, and other illnesses. Noting that that defendant "chose to distribute counterfeit and misbranded drugs to doctors, pharmacists, and pharmaceutical wholesalers, knowing that those customers would distribute the drugs to women with fertility problems and to Parkinson's disease patients," the Circuit saw "no error in the District Court's view that victims with fertility problems and/or Parkinson's disease are particularly vulnerable in this context." *Id.* at 74.   Similarly, in *United States* v. *Bradley*, 644 F.3d 1213 (11th Cir. 2011), the Eleventh Circuit affirmed application of this enhancement to a

defendants who, through their pharmaceutical wholesale business, defrauded Medicaid by charging for blood-derivatives medications – used to treat AIDS, hemophilia, and other illnesses – that, much like the medicines in this case, had previously been dispensed to other patients.  The Court approved application of the enhancement on those facts, concluding users of these medications "were vulnerable due to their medical condition – AIDS and hemophilia," concluding further that the defendant's fraud scheme "targeted them, exploiting their need for medication so he could make a profit."  *Id.* at 1289; *see also United States* v. *Dino*, 919 F.2d 72, 74 (8th Cir. 1990) ("Furthermore, [the defendant's] customers did not know they were buying drugs not meant for resale.  Because at least some of the drugs Dino sold had an unknown expiration date, and no lot or serial number with which to effect a recall, if necessary, customers were denied basic safeguards which drug companies take some pains to provide.").

That the patients were not the victims of the *financial* loss caused by the defendant's conduct is irrelevant because there is no requirement, in this context, "that a victim suffer part of the financial loss counted toward the total attributed to the defendant's fraud."  *Bradley*, 644 F.3d at 1288 n.128; *see also United States* v. *Echevarria*, 33 F.3d 175, 180 (2d Cir. 1994) ("[E]ven though there is a scam, . . . the economic impact of which is on the government, an enhancement for vulnerable victims is appropriate where the exploitation of patients is part of the scam.") (citation and internal quotation marks omitted).

Here, there is no question that the defendant's conduct, while causing a financial loss to Medicaid, involved the "exploitation of patients" – that is, the unsuspecting pharmacy customers who received these medications – who "were denied basic safeguards which drug companies take some pains to provide," *Dino*, 919 F.2d at 74, and who suffered from the sort of illnesses that courts have routinely deemed sufficient to render them "vulnerable" for purposes of the

enhancement. As such, and while the Government continues to believe the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(14) is appropriate on these facts, an enhancement for a scheme targeting vulnerable victims, as the defendant's scheme did, would similarly and appropriately address the severity of the defendant's conduct.[4]

### 4. *Abuse of Trust*

Finally, U.S.S.G. § 3B1.3 provides for a two-level enhancement where the defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense. The Guidelines define a "position of public or private trust [as] characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 app. n. 1; *see also United States* v. *Thorn*, 317 F.3d 107, 119-120 (2d Cir. N.Y. 2003).

Here, the defendant's offense turned directly on his ability to manipulate his position as the owner of a pharmacy to commit his crime – that is, to obtain and attempt to re-distribute these medications without detection. That the defendant's position is one "public or private trust," is evidenced not only by the clear "professional [and] managerial discretion" his job entailed – discretion to choose a supplier of the medicines his pharmacy stocked, for example,

---

[4] Were the Court to impose such an enhancement an additional two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(2) would seem appropriate because the "offense involved a large number of vulnerable victims." While the term "large number" is not defined in the Guidelines, the defendant's conduct, by his own calculation, involved the dispensing of more than 2,000 bottles of second-hand medications to these victims which would certainly seem to amount to a "large number" under any common sense definition of the term. *Cf. United States* v. *Kentz*, 251 F.3d 835, 843 (9th Cir. 2001) (affirming application of enhancement to telemarketing scheme involving 300 vulnerable victims).

without the sort of oversight that have caught the lack of appropriate paperwork – but also by the broader trust placed in the defendant by both the state and his patients.

With respect to the public trust, the defendant was licensed by the state to run a pharmacy, and was thereby invested through the licensure process with the state's trust to carry out the serious and potentially lethal work of a pharmacy.  The defendant abused that public trust, that license to operate as a pharmacy, in order to carry out his fraudulent scheme.   The scheme, in other words, would not have been possible but for that public trust, *i.e.*, that state license to operate.   Indeed, the Court itself observed, at the *Fatico* hearing, in noting the seriousness of the offense conduct, that the defendant "has obligations to the public [from] owning a pharmacy."  (Hearing Tr. 4:13-14.)

Similarly, the private trust – that of the defendant's myriad patients – cannot be understated.  Simply put, the defendant's patients put their lives in his hands, trusting that he was obtaining life-saving medicines from legitimate sources and before safely dispensing them. Indeed, New York courts have repeatedly held that, under state law, pharmacies have a "duty of care to exercise the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of business."  *Fagan* v. *AmerisourceBergen Corp.*, 356 F. Supp. 2d 198 (E.D.N.Y. 2004); *see also Negrin* v. *Alza Corp.*, 1999 U.S. Dist. LEXIS 3006, at * 4 (S.D.N.Y. Mar. 17, 1999) (same).  The defendant's own records document the thousands of times he betrayed that trust in direct furtherance of his fraud.

A two-level enhancement pursuant to U.S.S.G. § 3B1.3 for the repeated abuse that trust in a manner that plainly facilitated the commission of the offense conduct is thus also appropriate.

*        *        *        *

Consistent with the above, the Government respectfully submits that the defendant's total, adjusted offense level should be deemed 22 which, with a Criminal History Category of I, results in an advisory, applicable Guidelines range is 41 to 51 months' imprisonment.

## II.   DISCUSSION

In light of the nature of the instant offense as well as the history and characteristics of this defendant, the Government respectfully submits that a sentence within the advisory, applicable Guidelines range of 41 to 51 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.  Indeed, even should the Court calculate the Guidelines differently, the Government submits that a sentence within the range of 41 to 51 months' imprisonment is appropriate on these facts.

While many of the reasons such a sentence is appropriate have already been discussed at length above, two additional points bear mention in the context of consideration of the factors set forth in Title 18, United States Code, Section 3553(a), factors which militate forcefully in favor of a substantial sentence:

*First*, a substantial sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A). The defendant grossly abused his power and position as the owner of a pharmacy to commit a brazen fraud.  By buying powerful medicines on street corners from criminals, and then passing them off as new to unsuspecting customers, some of whom were counting on those medicines to treat fatal illnesses, the defendant not only endangered his patients' lives, but he greatly enriched himself at their expense, while fraudulently billing Medicaid for hundreds of thousands of dollars.   The defendant so repeatedly over a two-year period, stopping only because his black market suppliers – Santana and Diaz – were themselves arrested in July 2012.

The defendant's complete indifference to the health and well-being of his patients bears particular mention in this respect.  The defendant purchased these bottles in beer boxes and plastic bags on street corners, and in a Target parking lot, from criminals.  He did so knowing that the bottles had been previously dispensed and that the patient labels had been removed to conceal the bottles' true source so that his own patients would have no idea they were being given these black market, second-hand medications.   As the Court now knows, these medications were tainted with Ronsonol – a toxic chemical that is "harmful or fatal if swallowed" – which the defendant's patients were unknowingly ingesting each time they took a tablet dispensed by the defendant.   A substantial sentence, thus, is necessary to reflect the nature and seriousness of the defendant's crimes.

*Second*, a substantial sentence is necessary to afford adequate deterrence, both to the general public and to this defendant.  *See* 18 U.S.C. § 3553(a)(2)(B).   With respect to general deterrence, as the Court is at this point aware, the defendant was one participant in a massive, nationwide scheme:  the Government's investigation to date has led to the arrest of more than 60 participants in this scheme, who were collectively responsible for diverting and re-dispensing more than $500,000,000 worth of these second-hand medications.   And while these participants all played various roles, the scheme only worked – and only continues to work to date – because scheme participants can recruit people like this defendant who are willing to abuse their positions to re-dispense these second-hand medications – and fraudulently bill Medicaid for them a second time – knowing full well that the medications in question have been obtained illegally and under circumstances that would lead any reasonable person, and certainly any reasonable pharmacy owner, to question their safety.  A substantial sentence, thus, is both necessary and appropriate to

send a message to other pharmacy owners and other individuals in similar positions that participating in a scheme like this one is criminal and will result in prison time.

Deterrence, however, is also a factor that should weigh on the Court with respect to this defendant, who, as the Court correctly noted at the *Fatico* hearing, has showed a rather alarming dearth of acceptance of full responsibility for his actions.   Indeed, the defendant has repeatedly downplayed and minimized his conduct – telling the Court, under oath, that he dispensed these second-hand medicines approximately "30 times" over a two-year period (Plea Tr. 15:15), when, in truth and fact, by his own, revised account, he did so more than *2,000 times*.  Similarly, the defendant told Your Honor, under oath, that he only got involved in the scheme because he "just wanted to really help [Santana] out [because] he was in a financial crisis," when, in fact, the recorded calls offered by the Government at the *Fatico* hearing make clear that the defendant, not Santana, was the one constantly strapped for cash, and the defendant, not Santana, was the one frequently providing Santana and Diaz with new "lists" and calling to check on the status of his orders.  (*E.g.*,  GX 203-T, 208-T, 209-T, 210-T.)  And while the Government does not dispute the defendant's entitlement to a three-level reduction pursuant to U.S.S.G. § 3E1.1(a)-(b), the defendant's inability to grasp or accept responsibility for the true scope of his conduct should give this Court cause for concern about the likelihood of future, similar crimes.

A substantial sentence, thus, is equally appropriate to promote specific deterrence in this case.

### III.   CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence within the advisory, applicable Guidelines range of 41 to 51 months' imprisonment is appropriate here and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
       January 27, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By:     /s/ Edward B. Diskant_____
       Edward B. Diskant
       Jason A. Masimore
       Assistant United States Attorneys
       (212) 637-2294/2580